**PAWAR LAW GROUP, P.C.**
Vik Pawar
20 Vesey Street, Suite 1410
New York, NY 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIMOTHY FIDLER, derivatively on behalf of CELSION CORPORATION, | Case No.: |
| Plaintiff, | |
| vs. | |
| MICHAEL H. TARDUGNO, JEFFREY W. CHURCH, NICHOLAS BORYS, DONALD P. BRAUN, AUGUSTINE CHOW, FREDERICK J. FRITZ, ROBERT W. HOOPER, ALBERTO R. MARTINEZ, and ANDREAS VOSS, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT; AND** <br> **(4) WASTE OF CORPORATE ASSETS** |
| Defendants, | |
| and | <u>JURY TRIAL DEMANDED</u> |
| CELSION CORPORATION, | |
| Nominal Defendant. | |

## <u>SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Timothy Fidler ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Nominal Defendant Celsion Corporation ("Celsion" or the "Company"), files this

Verified Shareholder Derivative Complaint against Individual Defendants Michael H. Tardugno

("Tardugno"), Jeffrey W. Church ("Church"), Nicholas Borys ("Borys"), Donald P. Braun ("Braun"), Augustine Chow ("Chow"), Frederick J. Fritz ("Fritz"), Robert W. Hooper ("Hooper"), Alberto R. Martinez ("Martinez"), and Andreas Voss ("Voss") (collectively, the "Individual Defendants," and together with Celsion, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Celsion, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Celsion, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Celsion's directors and officers from November 2, 2015 through July 10, 2020, both dates inclusive (the "Relevant Period").

2.     Based in Lawrenceville, New Jersey, Celsion is a fully integrated developmental-stage biopharmaceutical company focused on leveraging its development and oncology expertise

to identify and advance new therapies intended to improve the treatment of cancer. Celsion's drug candidates are designed to provide more efficient, effective, and targeted oncology therapies that maximize efficacy while minimizing side effects common to cancer treatments, and that deliver improved benefit to patients either as standalone treatments or in combination with other treatments. The Company's portfolio contains two clinical-stage candidates, including Celsion's lead drug candidate, ThermoDox® ("ThermoDox")—a heat-activated liposomal encapsulation of doxorubicin[1] which has been evaluated in a phase 3 clinical trial in patients with primary liver cancer.

3.      After a failed phase 3 trial of ThermoDox, in combination with radiofrequency ablation ("RFA"), for the treatment of primary liver cancer (the "HEAT Study") in 2013, the Company announced in February 2014 that the U.S. Food & Drug Administration ("FDA") had granted clearance for a similar evaluation. Specifically, the Company would launch a pivotal, double-blind, placebo-controlled phase 3 clinical study of ThermoDox, in combination with standardized RFA, for the treatment of hepatocellular carcinoma (the most common type of primary liver cancer) in intermediate stage patients (the "Phase 3 OPTIMA Study"). The study was purportedly based upon a "comprehensive analysis" of data from the HEAT Study which supposedly suggested that ThermoDox may "significantly improve" overall survival[2] compared to patients whose legions undergo RFA treatment for 45 minutes or more.

---

[1] Doxorubicin is a commonly used anticancer drug. Encapsulation of doxorubicin inside liposomes decreases the cardiotoxicity associated with the free form of the drug while maintaining anticancer potency.
[2] "Overall survival" is based on death from any cause, i.e., not just the condition being treated. Therefore, it incorporates death of participants from side effects of the treatment, and effects on survival after relapse.

4.     In September 2014, Celsion initiated the Phase 3 OPTIMA Study, which was expected to enroll approximately 550 patients in 100 sites in North America, Europe, China, and the Asia-Pacific region. The "primary endpoint"[3] of the trial was overall survival.

5.     Beginning on November 2, 2015, Defendant Tardugno and the Individual Defendants hyped ThermoDox as the Company's leading drug candidate and touted its potential efficacy as a treatment for patients diagnosed with primary liver cancer to induce investors into artificially pumping up the value of the Company's share price.

6.     Specifically, throughout the Relevant Period, the Individual Defendants caused the Company to misrepresent the potential efficacy of ThermoDox as a treatment option for patients with primary liver cancer by describing the data and support for the Phase 3 OPTIMA Study as, *inter alia*, "clear and convincing," "overwhelming," and the "most persuasive." Similarly, the Individual Defendants caused the Company to describe the Phase 3 OPTIMA Study itself as, "ground-breaking[,]" suggesting that its chances of success were "as good as it gets" while also failing to disclose, among other things, appropriate risk factors in the Company's annual and quarterly reports filed with the SEC.

7.     However, the truth emerged on July 13, 2020, when the Company issued a press release announcing that the second pre-planned interim analysis carried out by the study's independent Data Monitoring Committee recommended stopping the Phase 3 OPTIMA Study since it had found that the "pre-specified boundary for stopping the trial for futility of 0.900 was

---

[3] In clinical trials, an "endpoint" is an event or outcome that can be measured objectively to determine whether the intervention being studied is beneficial. The "primary endpoint" is the endpoint for which the trial is powered.

crossed with an actual value of 0.903." In other words, just like the HEAT Study, the Phase 3 OPTIMA Study had failed.

8.      On this news, the price of the Company's stock plunged from $3.58 per share at the close of the previous trading day, on July 10, 2020, to $1.29 per share at the close of trading on July 13, 2020, representing a loss in value of $2.29 per share, or nearly 63.97%, on massive trading volume.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company exaggerated ThermoDox's promise and potential effectiveness for treatment of primary liver cancer; (2) the Phase 3 OPTIMA Study was not likely to result in its primary endpoint of overall survival thereby minimizing the chance for FDA approval and commercialization; and (3) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

12.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Medical Officer ("CMO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the current directors' liability in this derivative action and the CEO's liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of Celsion's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Celsion common stock. Plaintiff has continuously held Celsion common stock at all relevant times.

### Nominal Defendant Celsion

20.     Nominal Defendant Celsion is a Delaware corporation with its principal executive offices at 997 Lenox Drive, Suite 100, Lawrenceville, NJ 08648. Celsion stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "CLSN."

### Defendant Tardugno

21.     Defendant Tardugno has served as the Company's President and CEO since January 3, 2007, as a Company director since January 22, 2007, and as Chairman of the Board since October 2014. According to the Company's Schedule 14A filed with the SEC on April 29, 2020 (the "2020 Proxy Statement"), as of April 22, 2020, Defendant Tardugno beneficially owned

1,267,109 shares of the Company's common stock, which represented 4.94% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Tardugno owned over $1.4 million worth of Celsion stock.

22.     For the fiscal year ended December 31, 2019, Defendant Tardugno received $1,251,640 in compensation from the Company. This included $547,342 in salary, $179,800 in stock awards, $284,926 in option awards, $192,572 in non-equity incentive plan compensation, and $47,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Tardugno received $2,950,091 in compensation from the Company. This included $529,467 in salary, $2,002,005 in option awards, $372,119 in non-equity incentive plan compensation, and $46,500 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Tardugno received $1,302,546 in compensation from the Company. This included $506,609 in salary, $409,315 in option awards, $356,622 in non-equity incentive plan compensation, and $30,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Tardugno received $1,124,671 in compensation from the Company. This included $499,609 in salary, $33,250 in stock awards, $296,998 in option awards, $265,521 in non-equity incentive plan compensation, and $29,834 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Tardugno received $1,201,568 in compensation from the Company. This included $481,216 in salary, $438,480 in option awards, $256,563 in non-equity incentive plan compensation, and $25,309 in all other compensation.

23.     The Company's 2020 Proxy Statement stated the following about Defendant Tardugno:

**Mr. Michael H. Tardugno.** Mr. Tardugno was appointed President and Chief Executive Officer of the Company on January 3, 2007 and was elected to the Board of Directors on January 22, 2007. In October of 2014, Mr. Tardugno was appointed by our Board of Directors as our Chairman. Prior to joining the Company and for the period from February 2005 to December 2006, Mr. Tardugno served as Senior Vice President and General Manager of Mylan Technologies, Inc., a subsidiary of Mylan Inc. From 1998 to 2005, Mr. Tardugno was Executive Vice President of Songbird Hearing, Inc., a medical device company spun out of Sarnoff Corporation. From 1996 to 1998, he was Senior Vice President of Technical Operations worldwide for a division of Bristol-Myers Squibb, and from 1977 to 1995, he held increasingly senior executive positions including Senior Vice President of Worldwide Technology Development with Bausch & Lomb and Abbott Laboratories. Mr. Tardugno holds a B.S. degree from St. Bonaventure University and completed the Harvard Business School Program for Management Development.

### Defendant Church

24.     Defendant Church has served as the Company's Vice President, CFO and Corporate Secretary since July 2010 and as the Executive Vice President since December 2018. Previously, he served as the Company's Senior Vice President, Corporate Strategy and Investor Relations beginning in July 2011. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Church beneficially owned 374,249 shares of the Company's common stock, which represented 1.46% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Church owned nearly $419,159 worth of Celsion stock.

25.     For the fiscal year ended December 31, 2019, Defendant Church received $647,167 in compensation from the Company. This included $377,593 in salary, $54,520 in stock awards, $136,727 in option awards, $61,827 in non-equity incentive plan compensation, and $16,500 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Church received $1,126,392 in compensation from the Company. This included $354,733 in salary, $43,200 in

bonus, $588,825 in option awards, $123,134 in non-equity incentive plan compensation, and $16,500 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Church received $550,609 in compensation from the Company. This included $340,104 in salary, $112,685 in option awards, and $97,820 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2016, Defendant Church received $534,593 in compensation from the Company. This included $334,719 in salary, $15,960 in stock awards, $95,285 in option awards, $69,312 in non-equity incentive plan compensation, and $19,317 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Church received $553,696 in compensation from the Company. This included $311,434 in salary, $35,000 in bonus, $107,850 in option awards, $79,795 in non-equity incentive plan compensation, and $19,617 in all other compensation.

26.    The Company's 2020 Proxy Statement stated the following about Defendant Church:

> **Mr. Jeffrey W. Church.** Mr. Church joined us in July 2010 as Vice President, Chief Financial Officer and Corporate Secretary. Mr. Church was appointed as our Senior Vice President, Corporate Strategy and Investor Relations in July 2011. In July 2013, Mr. Church was reappointed as Senior Vice President and Chief Financial Officer. In December 2018, Mr. Church was promoted to Executive Vice President. Immediately prior to joining us, Mr. Church served as Chief Financial Officer and Corporate Secretary of Alba Therapeutics Corporation, a privately held life science company from 2007 until 2010. From 2006 until 2007, he served as Vice President, Chief Financial Officer and Corporate Secretary for Novavax, Inc., a vaccine development company listed on The Nasdaq Global Select Market. From 1998 until 2006, he served as Vice President, CFO and Corporate Secretary for GenVec, Inc., a biotechnology company listed on The Nasdaq Capital Market. Prior to that, he held senior financial positions at BioSpherics Corporation and Meridian Medical Technologies, both publicly traded companies. He started his career with Price Waterhouse from 1979 until 1986. Mr. Church holds a B.S. degree in accounting from the University of Maryland.

**Defendant Borys**

27.     Defendant Borys has served as the Company's Executive Vice President since February 2019, as the Company's Senior Vice President since June 2014, and the Company's Vice President and CMO since October 2007. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Borys beneficially owned 371,471 shares of the Company's common stock, which represented 1.45% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Borys owned approximately $416,048 worth of Celsion stock.

28.     For the fiscal year ended December 31, 2019, Defendant Borys received $700,708 in compensation from the Company. This included $409,999 in salary, $58,000 in stock awards, $136,727 in option awards, $67,182 in non-equity incentive plan compensation, and $28,800 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Borys received $1,155,246 in compensation from the Company. This included $398,032 in salary, $38,400 in bonus, $588,825 in option awards, $103,961 in non-equity incentive plan compensation, and $26,028 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Borys received $619,998 in compensation from the Company. This included $379,223 in salary, $112,685 in option awards, $119,840 in non-equity incentive plan compensation, and $8,250 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Borys received $571,899 in compensation from the Company. This included $373,579 in salary, $15,960 in stock awards, $97,857 in option awards, $76,254 in non-equity incentive plan compensation, and $8,249 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Borys received $561,450 in compensation from the Company. This included $360,215 in salary, $7,500 in bonus,

$107,850 in option awards, $78,270 in non-equity incentive plan compensation, and $7,615 in all other compensation.

29.     The Company's 2020 Proxy Statement stated the following about Defendant Borys:

**Nicholas Borys, M.D.** Dr. Borys joined us in October 2007 as Vice President and Chief Medical Officer of the Company and was promoted to Senior Vice President in June 2014 and to Executive Vice President in February 2019. In this position, Dr. Borys manages the clinical development and regulatory programs for Celsion. Dr. Borys has over 25 years of experience in all phases of pharmaceutical development with a focus on oncology. Immediately prior to joining Celsion, Dr. Borys served as Chief Medical Officer of Molecular Insight Pharmaceuticals, Inc., a molecular imaging and nuclear oncology pharmaceutical company, from 2004 until 2007. From 2002 until 2004, he served as the Vice President and Chief Medical Officer of Taiho Pharma USA, a Japanese start-up oncology therapeutics company. Prior to that he held increasingly senior positions at Cytogen Corporation, Anthra Pharmaceuticals, Inc., Amersham Healthcare, Inc. and Hoffmann La-Roche Inc. Dr. Borys obtained his premedical degree from Rutgers University and holds an M.D. degree from American University of the Caribbean.

**Defendant Braun**

30.     Defendant Braun has served as a Company director since December 2015. He also serves as a member of the Science and Technology Committee. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Braun beneficially owned 71,143 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Braun owned over $79,680 worth of Celsion stock.

31.     For the fiscal year ended December 31, 2019, Defendant Braun received $98,161 in compensation from the Company. This included $35,900 in fees earned and $62,261 in option awards. For the fiscal year ended December 31, 2018, Defendant Braun received $154,165 in compensation from the Company. This included $36,400 in fees earned and $117,765 in option awards. For the fiscal year ended December 31, 2017, Defendant Braun received $63,900 in

compensation from the Company. This included $34,900 in fees earned and $29,000 in option awards. For the fiscal year ended December 31, 2016, Defendant Braun received $42,050 in compensation from the Company. This included $35,400 in fees earned and $6,650 in stock grants. For the fiscal year ended December 31, 2015, Defendant Braun received $45,720 in compensation from the Company which consisted entirely of option awards.

32.     The Company's 2020 Proxy Statement stated the following about Defendant Braun:

**Dr. Donald P. Braun.** Dr. Braun brings over 30 years of research expertise in oncology, with a focus on immunotherapy and the effectiveness and impact of chemotherapy protocols on various cancers and tumor types. He served from 2006 to 2014 as Vice President Clinical Research and after which he served as Vice President Translational Research and Chief Science Officer at the Cancer Treatment Centers of America until his retirement in May 2016. Prior to this role, he was the Scientific Director of the Cancer Center and Professor of Medicine and Immunology at Rush Medical College in Chicago from 1978 to 1999, and the Administrative Director of the Cancer Institute and a Professor of Surgery with tenure at the Medical College of Ohio from 1999 to 2006. Dr. Braun has been appointed to and served on more than a dozen federal government and public advisory committees on oncology and immunology. He received his Ph.D. in Immunology and Microbiology from the University of Illinois at the Medical Center in Chicago.

**<u>Defendant Chow</u>**

33.     Defendant Chow has served as a Company director since March 2007. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Chow beneficially owned 106,466 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Chow owned approximately $119,242 worth of Celsion stock.

34.     For the fiscal year ended December 31, 2019, Defendant Chow received $103,261 in compensation from the Company. This included $41,000 in fees earned and $62,261 in option

awards. For the fiscal year ended December 31, 2018, Defendant Chow received $205,271 in compensation from the Company. This included $40,400 in fees earned and $164,871 in option awards. For the fiscal year ended December 31, 2017, Defendant Chow received $96,344 in compensation from the Company. This included $40,000 in fees earned and $56,344 in option awards. For the fiscal year ended December 31, 2016, Defendant Chow received $97,642 in compensation from the Company. This included $39,400 in fees earned, $6,650 in stock grants, and $51,592 in option awards. For the fiscal year ended December 31, 2015, Defendant Chow received $93,925 in compensation from the Company. This included $40,000 in fees earned and $53,925 in option awards.

35. The Company's 2020 Proxy Statement stated the following about Defendant Chow:

**Dr. Augustine Chow.** Dr. Chow was appointed to our Board of Directors in March 2007. Dr. Chow is the chairman of Harmony Asset Management Limited in Hong Kong, serving in such capacity since 2015. He also serves as a director of Medifocus Inc. (TSX Venture: MFS). From 1996 to 2015, Dr. Chow was the Chief Executive Officer of Harmony Asset Limited, a Hong Kong listed investment company, and from 2008 to 2016 he served as Executive Director of Kaisun Energy Group Limited. From 1990 to 1998, Dr. Chow was the Chief Executive Officer of Allied Group of Companies based in Hong Kong which include several publicly listed companies spanning across various industries. Prior to this, Dr. Chow held a senior position with Brunswick Corporation and Outboard Marine Corporation and was responsible for all business activities in South East Asia and China. Dr. Chow has extensive experience in managing publicly listed companies that are involved in manufacturing, marketing and financial services and specializes in mergers and acquisitions. Dr. Chow's qualifications include a number of Bachelors, Masters and Doctoral degrees. Among them include a MSc from London Business School and a Ph.D. in Biology from City University of Hong Kong.

**Defendant Fritz**

36. Defendant Fritz has served as a Company director since July 2011. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Fritz

- 14 -

beneficially owned 135,443 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Fritz owned over $151,696 worth of Celsion stock.

37.     For the fiscal year ended December 31, 2019, Defendant Fritz received $162,161 in compensation from the Company. This included $99,900 in fees earned and $62,261 in option awards. For the fiscal year ended December 31, 2018, Defendant Fritz received $263,771 in compensation from the Company. This included $98,900 in fees earned and $164,871 in option awards. For the fiscal year ended December 31, 2017, Defendant Fritz received $131,615 in compensation from the Company. This included $81,900 in fees earned and $49,715 in option awards. For the fiscal year ended December 31, 2016, Defendant Fritz received $143,694 in compensation from the Company. This included $102,900 in fees earned, $6,650 in stock grants, and $34,144 in option awards. For the fiscal year ended December 31, 2015, Defendant Fritz received $115,325 in compensation from the Company. This included $61,400 in fees earned and $53,925 in option awards.

38.     The Company's 2020 Proxy Statement stated the following about Defendant Fritz:

**Mr. Frederick J. Fritz.** Mr. Fritz was appointed to our Board of Directors in July 2011. Mr. Fritz has served as CEO and Founder of NeuroDx, a development stage diagnostic device company focused on the neurosurgery market, since 2006. Mr. Fritz joined NeuroDx from Valeo Medical, a biotechnology company he founded in 2003 to develop the world's first non-invasive diagnostic test for endometriosis. Prior to that, Mr. Fritz was President and CEO of Songbird Hearing, Inc., a medical device company spun out of Sarnoff Corporation. Mr. Fritz began his career in marketing management and new product development. He joined Schering Plough's Wesley Jessen in 1985 as VP Marketing and Sales in 1986. He was promoted to general manager of Schering's Over the Counter pharmaceutical business in 1988 and of the podiatric products business in 1990. He was President of Coleman North America from 1995 to 1997. Mr. Fritz holds a bachelor's degree in engineering (summa cum laude) from University of Illinois and an MBA degree from Harvard University.

**Defendant Hooper**

39.     Defendant Hooper has served as a Company director since July 2010. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Hooper beneficially owned 121,400 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Hooper owned $135,968 worth of Celsion stock.

40.     For the fiscal year ended December 31, 2019, Defendant Hooper received $108,361 in compensation from the Company. This included $46,000 in fees earned and $62,261 in option awards. For the fiscal year ended December 31, 2018, Defendant Hooper received $209,771 in compensation from the Company. This included $44,900 in fees earned and $164,871 in option awards. For the fiscal year ended December 31, 2017, Defendant Hooper received $93,715 in compensation from the Company. This included $44,000 in fees earned and $49,715 in option awards. For the fiscal year ended December 31, 2016, Defendant Hooper received $90,263 in compensation from the Company. This included $43,400 in fees earned, $6,650 in stock grants, and $40,213 in option awards. For the fiscal year ended December 31, 2015, Defendant Hooper received $97,425 in compensation from the Company. This included $43,500 in fees earned and $53,925 in option awards.

41.     The Company's 2020 Proxy Statement stated the following about Defendant Hooper:

> **Mr. Robert W. Hooper.** Mr. Hooper has served as a member of our Board of Directors since July 2010. He is currently President of Crows Nest Ventures, Inc. a privately held company, which provides advisory and consulting services to the

- 16 -

healthcare industry. From 1997 to 2001, Mr. Hooper served as President North America for IMS Health Incorporated, a healthcare information and market research company listed on The New York Stock Exchange. From 1993 to 1997, he served as President of Abbott Laboratories Canada. From 1989 to 1993, he served as Managing Director, Australia/Asia for Abbott Laboratories. Prior to that, he held increasingly senior positions at E.R. Squibb and Sterling Winthrop Labs. Mr. Hooper holds a bachelor's degree in biology from Wilkes University.

### **Defendant Martinez**

42.     Defendant Martinez served as a Company director from December 2010 until he retired on December 31, 2020. He also served as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Martinez beneficially owned 126,570 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Martinez owned over $141,758 worth of Celsion stock.

43.     For the fiscal year ended December 31, 2019, Defendant Martinez received $103,261 in compensation from the Company. This included $41,000 in fees earned and $62,261 in option awards. For the fiscal year ended December 31, 2018, Defendant Martinez received $205,271 in compensation from the Company. This included $40,400 in fees earned and $164,871 in option awards. For the fiscal year ended December 31, 2017, Defendant Martinez received $89,715 in compensation from the Company. This included $40,000 in fees earned and $49,715 in option awards. For the fiscal year ended December 31, 2016, Defendant Martinez received $82,470 in compensation from the Company. This included $39,400 in fees earned, $6,650 in stock grants, and $36,420 in option awards. For the fiscal year ended December 31, 2015, Defendant Martinez received $94,025 in compensation from the Company. This included $40,100 in fees earned and $53,925 in option awards.

44.     The Company's 2020 Proxy Statement stated the following about Defendant Martinez:

> **Dr. Alberto R. Martinez.** Dr. Martinez has served as a member of our Board of Directors since December 2010. He has been a consultant to the healthcare industry since 2008. From 2007 to 2008, Dr. Martinez served as the President and Chief Operating Officer of Talecris Biotherapeutics, Inc., a publicly traded life science company. Prior to that, Dr. Martinez served as Talecris' President and Chief Executive Officer from October 2005 until June 2007. Prior to that, he held increasingly senior positions as Executive Vice President of Worldwide Commercial Operations at ZLB Behring (subsequently renamed CSL Behring). Prior to ZLB Behring, Dr. Martinez served in various international positions at Sandoz Pharmaceuticals (currently the generic pharmaceuticals division of Novartis) in Brazil, Switzerland, Spain and the U.S. for eighteen years. Dr. Martinez completed his undergraduate and graduate studies at the University of Sao Paulo and received his medical degree from the University of Sao Paulo in 1973. After completing his residency in Pediatrics in 1975, he studied Business and Marketing Administration at the Fundacao Getulio Vargas in Sao Paulo, Brazil.

**Defendant Voss**

45.     Defendant Voss has served as a Company director since December 2015. He also serves as the Chair of the Science and Technology Committee. According to the 2020 Proxy Statement, as of April 22, 2020, Defendant Voss beneficially owned 77,393 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2020 was $1.12, Defendant Voss owned over $86,680 worth of Celsion stock.

46.     For the fiscal year ended December 31, 2019, Defendant Voss received $146,161 in compensation from the Company. This included $83,900 in fees earned and $62,261 in option awards. For the fiscal year ended December 31, 2018, Defendant Voss received $158,315 in compensation from the Company. This included $40,550 in fees earned and $117,765 in option awards. For the fiscal year ended December 31, 2017, Defendant Voss received $69,050 in

compensation from the Company. This included $40,050 in fees earned and $29,000 in option awards. For the fiscal year ended December 31, 2016, Defendant Voss received $48,550 in compensation from the Company. This included $41,900 in fees earned and $6,650 in stock grants. For the fiscal year ended December 31, 2015, Defendant Voss received $45,720 in compensation from the Company which consisted entirely of option awards.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Voss:

**Dr. Andreas Voss.** Dr. Voss served as Vice President of Clinical Affairs in Europe at Caris Life Sciences, a biotechnology company focused on implementing personalized medicine in oncology through its liquid biopsy technology until the end of 2018. Prior to joining Caris in 2010, he was responsible for the global clinical development of Avastin® and a member of the Corporate Drug Safety Board at F. Hoffmann-La Roche from 2006 to 2010. Before joining Roche in 2006, he was Medical Director for the Lung Cancer Disease Area at AstraZeneca, and from 2000 to 2003, he was the Medical Director for Anti-infectives and Oncology at Bayer GmbH. From 1996 to 2000, Dr. Voss was Head of Medical Research, Oncology at Asta Medica AG. Dr. Voss received his M.D. from the University of Hamburg Medical School and was a postdoctoral fellow at the University of California at San Diego. He is board certified in internal medicine.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

48.     By reason of their positions as officers, directors and/or fiduciaries of Celsion and because of their ability to control the business and corporate affairs of Celsion, the Individual Defendants owed Celsion and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Celsion in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Celsion and its shareholders so as to benefit all shareholders equally.

49.     Each director and officer of the Company owes to Celsion and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Celsion, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the officers and directors of Celsion were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Celsion, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Celsion's Board at all relevant times.

53.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

54.    To discharge their duties, the officers and directors of Celsion were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Celsion were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Celsion's own Code of Ethics and Business Conduct for Directors, Officers and Employees (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Celsion conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Celsion and procedures for the reporting of the business and internal affairs

to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Celsion's operations would comply with all laws and Celsion's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.     Each of the Individual Defendants further owed to Celsion and the shareholders the duty of loyalty requiring that each favor Celsion's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Celsion and were at all times acting within the course and scope of such agency.

57.     Because of their advisory, executive, managerial, and directorial positions with Celsion, each of the Individual Defendants had access to adverse, non-public information about the Company.

58.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Celsion.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the

Individual Defendants who are directors of Celsion was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Celsion, and was at all times acting within the course and scope of such agency.

## CELSION'S CODE OF ETHICS

64.     Celsion's Code of Ethics provides that it "sets out basic principles that apply to Celsion's directors, officers, and employees" and that the Company expects "others acting as our agents and representatives, including consultants, will comply with the terms of this Code."

65.     The Code of Ethics further provides that "[a]ll of [Celsion's] personnel must conduct themselves in accordance with the terms of the Code and must seek to avoid even the appearance of improper behavior" and that "[a]nyone who violates the standards in this Code will be subject to disciplinary action up to and including termination."

66.     In a section titled, "Governing Principles," the Code of Ethics states the following:

**Treat in an Ethical Manner Those to Whom We Have an Obligation**

- 24 -

We are committed to honesty, just management, fairness, providing a safe and healthy environment and respecting the fundamental dignity due each individual.

* * *

For our stockholders, we are committed to pursuing sound growth and earnings objectives and to exercising prudence in the use of our resources.

For our suppliers and partners, we are committed to fair competition and the sense of responsibility required to build and maintain sound business relationships.

(Emphasis in original.)

67.     The section of the Code of Ethics titled, "Governing Principles," further provides,

in relevant part, that:

**Obey the Law**

Compliance with law, both in letter and in spirit, is the foundation of this Company's ethical standards. All personnel must respect and obey the laws of the cities, states, and countries in which we do business. The Company and its personnel are subject to all applicable governmental laws, rules, and regulations, including those of the U.S. Securities and Exchange Commission (SEC). Although not all personnel are expected to know the details of all of these laws, it is important to know enough to determine when to seek advice from supervisors or other appropriate personnel. Compliance with the law does not, however, comprise our entire ethical responsibility. Rather, it is a minimum, absolutely essential condition for performance of our duties.

(Emphasis in original.)

68.     In a section titled, "Specific Policies and Guideline," the Code of Ethics states the

following, in relevant part:

**Enable Prompt, Accurate, Fair and Complete Public Disclosure**

As a public company, it is our policy to ensure that the information in our public communications, including SEC filings and stockholders communications, is full, fair, timely, accurate, and understandable. All personnel involved in the Company's disclosure process are responsible for furthering and supporting this policy. Our Chief Executive Officer and Chief Financial Officer are particularly charged with maintaining familiarity with the disclosure requirements applicable to Celsion, and

any other officer, director or employee who has a supervisory role in our disclosure process is obligated to discharge his or her obligations diligently.

The securities laws are vigorously enforced. Violations may result in severe penalties including significant fines against the Company. There may also be sanctions against individual employees, including substantial fines and prison sentences.

Our Chief Executive Officer and Chief Financial Officer are required to certify the accuracy of reports filed with the SEC in accordance with the Sarbanes-Oxley Act of 2002. Officers who knowingly or willfully make false certifications may be subject to criminal penalties or sanctions, including fines and imprisonment.

(Emphasis in original.)

69.     In a section titled, "Maintain Accurate and Complete Business and Financial Records," the Code of Ethics states the following, in relevant part:

We must maintain honest and accurate business and financial records in order to make responsible business decisions and to comply with our obligations under various laws, rules, and regulations to which we are subject.

* * *

All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal controls. There are absolutely no circumstances under which transactions should not be fully and fairly characterized and recorded or under which records of transactions, once made and approved in accordance with our internal procedures, should be altered.

Business records and communications that you believe to be confidential may nonetheless become public. Therefore, we should exercise care and good sense in our writings and should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people or companies. This applies equally to written communications, including e-mail, internal memos, and formal reports.

70.     In a section titled, "Compete Fairly and Ethically for Business Opportunities," the Code of Ethics states, in relevant part, that the Company seeks "success by competing fairly and honestly" and that it seeks "advantage through superior performance and not through unethical or

- 26 -

illegal business practices." The Code of Ethics further states that the Company's, "personnel should respect the rights of and deal fairly with the Company's customers, suppliers, and competitors" and that it is "impermissible to take unfair business advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation or any other intentional, unfair, or unethical practice."

71.     In a section titled, "Compliance," the Code of Ethics states, in relevant part, "[w]e must all work to ensure prompt and consistent action against violations of this Code" and that "[i]f you become aware of an action or failure to take action that you believe is or will result in a violation of this Code, you must report such action or failure to act either to your immediate supervisor, the Chief Financial Officer or the Audit Committee pursuant to our Whistleblower Policy."

72.     In a section titled, "Enforcement; Disciplinary Measures," the Code of Ethics states that "[t]he Company will consistently enforce this Code of Ethics and Business Conduct through appropriate disciplinary means. Potential violations of the Code promptly will be reported to the Audit Committee.

73.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply

with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

74.     Celsion was initially founded in 1982 as a Maryland-based company dedicated to creating and marketing medical treatment systems for various diseases including breast cancer under the moniker "A.Y. Cheung Associates, Inc." ("Cheung Associates") before changing its name to "Cheung Laboratories, Inc." ("Cheung Laboratories") in 1984. The Company was incorporated in Delaware in May 2000. After a rebrand to Celsion in 1998, the Company later split with its founder eight years later, in 2006 and, in doing so, shifted its business model to its current iteration, a drug development company. About five years later, upon acquiring the intellectual property rights to ThermoDox in 2011, the Company raised millions of dollars in financing, and eventually relocated to New Jersey, primarily to attract talent that could market, sell, and distribute Celsion's pharmaceutical products.

75.     The Company currently operates as a fully integrated development-stage biopharmaceutical company focused on leveraging its development and oncology expertise to identify and advance new therapies intended to improve the treatment of cancer.

76.     Celsion's portfolio of drug candidates is designed to develop and commercialize more efficient, effective, and targeted oncology therapies that maximize efficacy while minimizing side effects common to cancer treatments, and that deliver improved benefit to patients either as standalone treatments or in combination with other treatments. The Company's portfolio contains two clinical-stage candidates, including Celsion's lead drug candidate, ThermoDox, a heat-

activated liposomal encapsulation of doxorubicin. According to the Company's annual report filed on Form 10-K with the SEC for the fiscal year ended December 31, 2019 (the "2019 10-K"), Celsion has incurred substantial operating losses since its inception. The 2019 10-K specifically provides that the Company incurred net losses of $16.9 million and $11.9 million for the years ended December 31, 2019 and 2018, respectively, and that the Company has accumulated a deficit which totaled approximately $291 million as of December 31, 2019.

77.     In 2012, the Company launched the HEAT Study. However, the HEAT Study failed to meet the primary endpoint of progression-free survival[4] in January 2013. In February 2014, Celsion issued a press release announcing that the FDA had granted clearance for the Phase 3 OPTIMA Study. The trial design was supposedly founded upon a "comprehensive analysis" of data from the HEAT Study which purportedly revealed that a significant number of patients with hepatocellular carcinoma ("HCC") who were treated with ThermoDox, in combination with RFA, benefited from a 55% improvement in overall survival.

78.     The Phase 3 OPTIMA Study expected to enroll 550 patients globally at up to 100 clinical sites in North America, Europe, China, and the Asia-Pacific region to evaluate ThermoDox in combination with standardized RFA for the treatment of primary liver cancer. The Phase 3 OPTIMA Study would also require a minimum of 45 minutes for treating lesions three to seven centimeters, versus standardized RFA alone. The primary endpoint of the Phase 3 OPTIMA Study was overall survival, with secondary endpoints of progression-free survival and safety. Additionally, Phase 3 OPTIMA Study would include two interim efficacy analysis by an

---

[4] Progression-free survival is the length of time during and after the treatment of a disease that a patient lives with the disease but it does not get worse.

independent Data Monitoring Committee to ensure that the interests of the patients entered on the trial were being well-served and that the scientific integrity of the trial was maintained during the interim between trial initiation and trial completion.

**False and Misleading Statements**

*November 2, 2015 Press Release*

79.    On November 2, 2015, before the market opened, the Company issued a press release announcing, "the presentation of data from the Company's HEAT Study, highlighting the curative potential for ThermoDox® plus optimized radiofrequency ablation (RFA) in intermediate primary liver cancer, also known as hepatocellular carcinoma (HCC), as well as preclinical data on the correlation of heating duration during RFA in combination with ThermoDox." The press release also boasted the following, in pertinent part:

> "There is clear evidence that the duration of the RFA regimen is critical when treating patients with ThermoDox," said Professor Tak, lead investigator in South Korea for the Company's HEAT and OPTIMA studies. "Findings from the data presented at ACTA, including the multivariate analysis, HEAT Study data demonstrating compelling survival outcomes and supportive preclinical data, underscore the importance of Celsion's ongoing OPTIMA Study, which is designed to demonstrate the potential of ThermoDox with an optimized RFA regimen in this setting."

80.    The lead investigator in Taiwan for the Company's HEAT Study and Phase 3 OPTIMA Study, Dr. Shi-Ming Lin, who was also the vice chairman of the Department of Gastroenterology and Hepatology at Chang Gung Memorial Hospital in Taiwan, was quoted in the press release, stating that the "totality of the data presented demonstrate that ThermoDox plus optimized RFA has a strong potential to serve as a curative therapy for patients with liver cancer, where there exists a strong unmet need for effective treatment options."

### *November 7, 2015 Earnings Call*

81.     On November 7, 2015, the Company hosted an earnings call with investors to discuss Celsion's financial results for the third fiscal quarter ended September 30, 2015. During the call, Defendant Tardugno touted the Company's lead drug candidate, ThermoDox, and the progress of the Phase 3 OPTIMA Study. Defendant Tardugno stated, in pertinent part, that:

> ***The message from the medical community could not be clearer, the OPTIMA Study based on convincing timings from the OS subgroup that we've been following, has the potential to be the best and perhaps the only new opportunity for HCC patients in the foreseeable future.***
>
> \* \* \*
>
> We view the OPTIMA study as a highly U.S. pivotal trial with strong supportive data from the HEAT Study further supported by multivariate analyses and with the prospect of revealing preclinical data, while our competing trials can [add a deviant] to our primary liver cancer at this time.

(Emphasis added.)

### *May 16, 2016 Press Release and Earnings Call*

82.     On May 16, 2016, the Company issued a press release and hosted an earnings call for investors in connection with Celsion's financial results for the first fiscal quarter ended March 31, 2016. Defendant Tardugno was quoted in the press release, stating, in relevant part:

> "We have made great strides to advance our global Phase III OPTIMA Study evaluating ThermoDox® in primary liver cancer with clinical sites currently enrolling patients in 13 countries world-wide. With enrollment now open in China and approximately 50% of the 850,000 new cases of primary liver cancer diagnosed each year originating there, China represents a significant market opportunity and key element of our global development and commercialization strategy for ThermoDox® . . . ."

83.     During the earnings call, Defendant Tardugno continued to tout ThermoDox and progress of the Phase 3 OPTIMA Study, stating, in relevant part, that:

In summary, primary liver cancer represents the largest unmet medical need remaining in oncology. We are committed to fully exploring the potential that ThermoDox has demonstrated so far. We are pleased with the progress we have seen in the OPTIMA trial and we remain on track to complete enrollment on or around, tough, now with China coming on, on or around the end of 2017. That would be followed by a preplanned interim efficacy analysis, the first of two which should read out in the first half of 2018.

### July 11, 2016 Press Release

84.     On July 11, 2016, the Company issued a press release announcing that Celsion's ongoing Phase 3 OTPIMA trial was featured during a presentation at the 7th Asia-Pacific Primary Liver Cancer Expert Meeting. The press release highlighted that, "[t]he strength of the preclinical and clinical data to date reinforces our confidence in the potential of ThermoDox in HCC and for a successful trial outcome," and that "[w]e are extremely encouraged with the investigators' interest and enthusiasm for our approach. With the trial enrolling patients in 13 countries, and in 9 of up to 20 sites in the Peoples Republic of China, we remain focused on the efficient execution of the only active Phase III study in newly diagnosed HCC patients."

### August 15, 2016 Press Release and Earnings Call

85.     On August 15, 2016, the Company issued a press release and hosted an earnings call in connection with Celsion's financial results for the second fiscal quarter ended June 30, 2016. Defendant Tardugno was quoted in the press release, stating, in relevant part:

"We have also made great strides to advance our global Phase III OPTIMA Study evaluating ThermoDox® in primary liver cancer, with clinical sites currently enrolling patients in 13 countries worldwide. In addition, data presentations and publications in multiple peer-reviewed forums continue to highlight the potential for a curative approach of ThermoDox® plus optimized RFA . . . ."

86.     During the earnings call, Defendant Tardugno continued to tout ThermoDox and progress of the Phase 3 OPTIMA Study, stating, in relevant part, that:

- 32 -

So in summary, primary liver cancer represents the largest unmet medical need in oncology, we are committed to fully exploring the potential of ThermoDox which has demonstrated thus far and we are pleased with further progress we've seen in our OPTIMA trial and remain on-track to complete enrollment and/or in or around the end of 2017 followed by a preplanned interim efficacy analysis, hopefully the first and only but we have two preplanned in the study followed by the preplanned interim efficacy analysis read on in 2018.

### November 10, 2016 Press Release

87.    On November 10, 2016, the Company issued a press release in connection with Celsion's financial results for the third fiscal quarter ended September 30, 2016. Defendant Tardugno was quoted in the press release, stating, in relevant part:

"Our ongoing global, pivotal Phase III OPTIMA Study of ThermoDox® in primary liver cancer remains on track with clinical sites currently enrolling patients in 13 countries worldwide. Investigators continue to recognize the value of findings from the HEAT Study and their continued interest reinforces substantial and mounting support for the OPTIMA Study. The recent independent analysis conducted by the National Institutes of Health provides further confirmatory support indicating that the use of radiofrequency ablation (RFA) for more than 45 minutes in patients treated with ThermoDox® can have a correlative impact on reductions in tumor size and overall survival in patients with primary liver cancer."

### November 11, 2016 Earnings Call

88.    The next day, on November 11, 2016, the Company hosted an earnings call in connection with Celsion's financial results for the third fiscal quarter ended September 30, 2016. During the call, Defendant Tardugno continued to tout the ThermoDox and progress of the Phase 3 OPTIMA Study, stating, in relevant part, that "[a]t the same time, data supporting the OPTIMA study become stronger, if not encounter vertical with each analysis, now for over four years, no matter whether conducted by Celsion or independently scrutinized."

*November 30, 2016 Press Release*

89.    On November 30, 2016, the Company issued a press release announcing that the

Data Monitoring Committee unanimously recommended the continuation of the Company's Phase

3 OPTIMA Study. The press release stated in relevant part that:

> "Following the recent presentation by the NIH confirming our hypothesis that ThermoDox® in combination with optimized RFA can be a treatment with curative intent for HCC, we could not be more pleased that the DMC has recommended continuation of the OPTIMA Study without modification. Based on their review of all the available study data, the DMC has concluded that ThermoDox is safe for newly diagnosed, intermediate stage patients and that the study is being conducted according to the highest of clinical research standards[.]"

> \* \* \*

> "We remain optimistic and encouraged by this decision, and by the potential that ThermoDox® has consistently demonstrated in patients with primary liver cancer, a patient population in dire need of new therapeutic options."

*December 16, 2016 Press Release*

90.    On December 16, 2016, the Company issued a press release providing an

encouraging update on the Company's Phase 3 OPTIMA Study. Defendant Tardugno was quoted

in the press release, stating, in relevant part:

> "We are building momentum with our efforts for ThermoDox in the Asia Pacific region, particularly China, which represents a significant market opportunity with over 50% of new diagnosed cases of this devastating cancer[.]"

> \* \* \*

> " . . . . We believe that the remarkable data from the Chinese cohort of the HEAT study underscores the potentially curative nature of ThermoDox in patients with primary liver cancer, and we are pleased that the CFDA has both recognized its potential and offered a straightforward path to a regulatory filing in China."

*March 16, 2017 Press Release and Earnings Call*

91.    On March 16, 2017, the Company issued a press release and hosted an earnings call with investors in connection with Celsion's financial results for the fourth fiscal quarter and full fiscal year ended December 31, 2016. The press release stated, in relevant part:

> ["] With sound fundamentals, the superb execution of our ongoing global, pivotal Phase III OPTIMA Study in primary liver cancer, continues to attract interest and support from the medical community, international regulatory agencies, and research organizations like the National Institutes of Health for this ground-breaking study[.]"

92.    During the earnings call, Defendant Tardugno continued to tout ThermoDox and the progress of the Company's Phase 3 OTPIMA study, stating, in pertinent part:

> During 2016, we made significant progress with our lead trial, the Phase 3 OPTIMA study, which is evaluating ThermoDox in combination with optimized RFA, optimized meaning standardized to a minimum of 45 minutes across all investigators at all sites for treating larger single lesions greater than three centimeters versus optimized RFA alone in the same population.
>
> * * *
>
> NIH concluded its discussion in a very well attended to a large audience, concluded this discussion with clear and convincing support for the OPTIMA study. We believe that this analyses not only advances our understanding of ThermoDox and its potential curative implication, that's not our words we hear that from researchers and presenters quite regularly now, the curative implication of a single dose of ThermoDox in combination with controlled RFA in patients with larger lesions, larger HCC lesions, the curative potential. It also strengthens our confidence in our ongoing global Phase 3 OPTIMA study.

*May 12, 2017 Press Release, Earnings Call, and Form 10-Q*

93.    On May 12, 2017, the Company issued a press release and hosted an earnings call in connection with Celsion's financial results for the first fiscal quarter ended March 31, 2017. Defendant Tardugno was quoted in the press release, stating, in relevant part:

"Celsion continues to make major progress with respect to our ongoing global, pivotal Phase III OPTIMA Study in primary liver cancer. This ground-breaking study continues to attract interest and support from the medical community, international regulatory agencies, and research organizations like the National Institutes of Health[.]"

94.     During the earnings call, Defendant Tardugno continued to tout ThermoDox and the progress of the Company's Phase 3 OTPIMA study, stating, in pertinent part:

So in summary, with minimal operation risk, we are now looking forward to study completion and data. ***If you believe our many analyses that support the OPTIMA study or if you have any confidence in the independent opinion of the National Institute of Health, then you should have to agree that there are chances of success with our OPTIMA study is as good as it gets in our industry***.

(Emphasis added.)

95.     Also on May 12, 2017, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendants Tardugno and Church, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

96.     The 1Q17 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study, which is described below. ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients*** from the HEAT Study.

\* \* \*

- 36 -

*These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion* (n=285, 41% of the HEAT Study patients), *treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone*. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. *Median OS for the ThermoDox® group has been reached which translates into a two year survival benefit over the optimized RFA group* (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

97.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 1Q17 10-Q contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

98.    The 1Q17 10-Q further stated, the following, in relevant part:

On November 29, 2016, the Company announced the results of an independent analysis conducted by the National Institutes of Health (the "NIH") from the HEAT Study *which reaffirmed the correlation between increased RFA burn time per tumor volume and improvements in overall survival*. The NIH analysis, which sought to evaluate the correlation between RFA burn time per tumor volume (min/ml) and clinical outcome, *concluded that increased burn time per tumor volume significantly improved overall survival in patients treated with RFA plus ThermoDox®* compared to patients treated with RFA alone.

(Emphasis added.)

*August 7, 2017 Press Release*

99.    On August 7, 2017, the Company issued a press release providing an encouraging update on the Company's Phase 3 OPTIMA Study and announcing that an independent Data Monitoring Committee completed a mid-study review and unanimously recommended that the study continue. Defendant Borys was quoted in the press release, stating, in relevant part:

" . . . . Based on their review of all the available study data from 275 patients enrolled as of April 2017, the DMC has concluded that ThermoDox® is safe for newly diagnosed, intermediate stage patients and that the study is being conducted according to the highest of clinical research standards[.]"

\* \* \*

"A key component of the OPTIMA Study protocol is the investigators' adherence to the recommended RFA heating time for tumors greater than 3 cm. We are pleased to report that there has been a greater than 99% compliance rate with the study protocol."

100.    Defendant Tardugno was also quoted in the press release, stating, in relevant part:

"We are very pleased that the [Data Monitoring Committee] has unanimously recommended continuation of the OPTIMA study based on their review of all available clinical data, both safety and efficacy, in over 275 patients[.]"

\* \* \*

"The [Data Monitoring Committee's] affirmative review is further evidence of ThermoDox's potential to provide a new and important first line therapeutic option for patients with primary liver cancer."

### *August 14, 2017 Form 10-Q*

101.    On August 14, 2017, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

102.    The 2Q17 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study, which is described below.

*The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients* from the HEAT Study.

* * *

*These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion* (n=285, 41% of the HEAT Study patients), *treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone.* The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. *Median OS for the ThermoDox® group has been reached which translates into a two year survival benefit over the optimized RFA group* (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

103.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 2Q17 10-Q contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

104.    The 2Q17 10-Q further stated, the following, in relevant part:

On November 29, 2016, the Company announced the results of an independent analysis conducted by the National Institutes of Health (the "NIH") from the HEAT Study *which reaffirmed the correlation between increased RFA burn time per tumor volume and improvements in overall survival.* The NIH analysis, which sought to evaluate the correlation between RFA burn time per tumor volume (min/ml) and clinical outcome, *concluded that increased burn time per tumor volume significantly improved overall survival in patients treated with RFA plus ThermoDox®* compared to patients treated with RFA alone.

(Emphasis added.)

- 39 -

*August 15, 2017 Press Release and Earnings Call*

105.    On August 15, 2017, the Company issued a press release and hosted an earnings

call with investors in connection with Celsion's financial results for the second fiscal quarter ended

June 30, 2017. Defendant Tardugno was quoted in the press release, stating, in relevant part:

> "We have also made great strides to advance our global Phase III OPTIMA Study
> evaluating ThermoDox® in primary liver cancer, with clinical sites currently
> enrolling patients in 14 countries worldwide. In addition, we are pleased to report
> that the independent Data Monitoring Committee recently recommended
> continuation of the OPTIMA Study after their review of the safety and efficacy data
> for 275 patients enrolled in the study. ["]

106.    During the earnings call, Defendant Tardugno continued to tout ThermoDox and

the progress of the Company's Phase 3 OTPIMA study, stating, in pertinent part:

> So, with virtually no operational risk and all the major costs behind us, we now
> look forward to study completion and data readout, and ***if you believe the many
> analyses supporting OPTIMA conducted by the company and by others,
> including an independent analysis of the OS data conducted by the National
> Institutes of Health, that's the NIH, and you have to agree that our chances for
> success in this very important study are quite good***.

(Emphasis added.)

*September 27, 2017 Press Release*

107.    On September 27, 2017, the Company issued a press release providing an

encouraging update on the Company's Phase 3 OPTIMA Study. Defendant Tardugno was quoted

in the press release, stating, in relevant part:

> "With independent confirmation by the NIH of the relationship between RFA
> heating time and the significant impact that it has on overall survival when
> combined with ThermoDox®, OPTIMA Study investigators fully recognize the
> value of the findings from the HEAT Study, reinforcing their interest and support
> for our highly de-risked, ongoing global Phase III OPTIMA Study[.]"

\* \* \*

- 40 -

"The previously announced unanimous recommendation for study continuation by the independent Data Monitoring Committee was based on their review of all available clinical data from 275 patients, and is further evidence of ThermoDox's recognized potential to provide a new and important first line therapeutic option for patients with primary liver cancer."

***November 14, 2017 Earnings Call and Form 10-Q***

108.    On November 14, 2017, the Company hosted an earnings call with investors in connection with Celsion's financial results for the third fiscal quarter ended September 30, 2017. During the call, Defendant Tardugno stated, in relevant part:

While the hypothesis is supported with ***some of most persuasive and productive perspective and retrospective data that has ever been taken in my experience for clinical trial***. Much of this data analysis [w]ere included and accepted by peer review and recently published manuscript of the HEAT study in clinical cancer research.

(Emphasis added.)

109.    Also on November 14, 2017, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

110.    The 3Q17 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study, which is described below. ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients*** from the HEAT Study.

* * *

- 41 -

> *These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion* (n=285, 41% of the HEAT Study patients), *treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone*. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. *Median OS for the ThermoDox® group has been reached which translates into a two year survival benefit over the optimized RFA group* (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

111.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 3Q17 10-Q contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

112.    The 3Q17 10-Q further stated, the following, in relevant part:

> On November 29, 2016, the Company announced the results of an independent analysis conducted by the National Institutes of Health (the "NIH") from the HEAT Study *which reaffirmed the correlation between increased RFA burn time per tumor volume and improvements in overall survival*. The NIH analysis, which sought to evaluate the correlation between RFA burn time per tumor volume (min/ml) and clinical outcome, *concluded that increased burn time per tumor volume significantly improved overall survival in patients treated with RFA plus ThermoDox®* compared to patients treated with RFA alone.

(Emphasis added.)

### March 27, 2018 Form 10-K

113.    On March 27, 2018, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Tardugno, Church, Braun, Chow, Fritz, Hooper, Martinez, and Voss, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the

- 42 -

financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

114.    The 2017 10-K stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

> The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study (the "HEAT Study"), which is described below. ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients*** from the HEAT Study.
>
> * * *
>
> ***These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion*** (n=285, 41% of the HEAT Study patients), ***treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone***. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. ***Median OS for the ThermoDox® group has been reached which translates into a two-year survival benefit over the optimized RFA group*** (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

115.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 2017 10-K contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

116.    The 2017 10-K further stated, the following, in relevant part:

> On November 29, 2016, the Company announced the results of an independent analysis conducted by the National Institutes of Health (the "NIH") from the HEAT Study ***which reaffirmed the correlation between increased RFA burn time per tumor volume and improvements in overall survival***. The NIH analysis, which

sought to evaluate the correlation between RFA burn time per tumor volume (min/ml) and clinical outcome, *concluded that increased burn time per tumor volume significantly improved overall survival in patients treated with RFA plus ThermoDox®* compared to patients treated with RFA alone.

\* \* \*

Additionally, the article explores a new hypothesis prompted by these findings: ThermoDox® when used in combination with Radiofrequency Ablation (RFA) standardized to a minimum dwell time of 45 minutes (sRFA > 45 minutes), may *increase the overall survival (OS) of patients with HCC*.

(Emphasis added.)

### March 30, 2018 Proxy Statement

117.   On March 30, 2018, the Company filed its Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Tardugno, Braun, Chow, Fritz, Hooper, Martinez, and Voss solicited the 2018 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

118.   The 2018 Proxy Statement called for shareholder approval of, among other things: (1) the election of two directors, and (2) the approval of the Celsion Corporation 2018 Stock Incentive Plan (the "2018 Plan") which requested an additional 2.7 million shares of common stock be available for awards to incentivize the Company's employees to achieve short- and long-term goals (the "2018 Proposal").

119.   With respect to the Company's Code of Ethics, the 2018 Proxy Statement stated, that it is "applicable to [the Company's] directors, officers, including the Chief Executive Officer,

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Chief Financial Officer, Chief Accounting Officer and other officers performing similar functions, and employees" and that it "constitutes a code of ethics applicable to senior financial officers within the meaning of the Sarbanes-Oxley Act of 2002 and SEC rules."

120.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

121.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company exaggerated ThermoDox's promise and potential effectiveness for treatment of primary liver cancer; (2) the Phase 3 OPTIMA Study was not likely to result in its primary endpoint of overall survival thereby minimizing the chance for FDA approval and commercialization; and (3) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

122.    As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders, among other things, elected Defendants Hooper and Martinez, which allowed them to continue breaching their fiduciary duties to Celsion, and approved the 2018 Proposal.

### *May 11, 2018 Earnings Call and Form 10-Q*

123.    On May 11, 2018, the Company hosted an earnings call with investors in connection with Celsion's financial results for the first fiscal quarter ended March 31, 2018. During the call, Defendant Tardugno touted ThermoDox and the progress of the Company's Phase 3 OPTIMA Study, stating, in relevant part, that "[o]ur investigators are excited about the results

that concluded that the single dose of ThermoDox with properly administered RFA has the potential to be cured. We have been presenting this narrative at multiple medical conferences over the last number of years."

124.    Also on May 11, 2018, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

125.    The 1Q18 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

> The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study, which is described below. ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients*** from the HEAT Study.
>
> * * *
>
> ***These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion*** (n=285, 41% of the HEAT Study patients), ***treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone***. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. ***Median OS for the ThermoDox® group has been reached which translates into a two year survival benefit over the optimized RFA grou***p (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

126.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 1Q18 10-Q contained generic language related to how "[d]rug

development is an inherently uncertain process with a high risk of failure at every stage of

development."

127.    The 1Q18 10-Q further stated, the following, in relevant part:

On November 29, 2016, the Company announced the results of an independent analysis conducted by the National Institutes of Health (the "NIH") from the HEAT Study *which reaffirmed the correlation between increased RFA burn time per tumor volume and improvements in overall survival*. The NIH analysis, which sought to evaluate the correlation between RFA burn time per tumor volume (min/ml) and clinical outcome, *concluded that increased burn time per tumor volume significantly improved overall survival in patients treated with RFA plus ThermoDox®* compared to patients treated with RFA alone.

(Emphasis added.)

*August 14, 2018 Earnings Call and Form 10-Q*

128.    On August 14, 2018, the Company hosted an earnings call with investors in

connection with Celsion's financial results for the second fiscal quarter ended June 30, 2018.

During the call, Defendant Tardugno touted ThermoDox and the progress of the Company's Phase

3 OPTIMA Study, stating, the following, in relevant part:

That the final readout of 550 patient studies Optima study powered to detect a 33% reduction in the risk for death. *The evidence supporting the thesis for the Optima study is overwhelming* and is based on our understanding of the application of RFA for 3 centimeter and larger lesions and the survival impact when RFA used correctly that is for 45 minutes heating and combined with ThermoDox. In 285 patient subgroup that was 42% of the entire population from a prior heat study a group that was followed every quarter for 2.5 years many time death in the treatment arm was never reached after 80 months. That's more than 7.5 years median survival more than two years better than the control group, again single dose of ThermoDox with properly used RFA in intermediate sized tumors has the potential to be curative now that's not my word that's the word our investigators are using when they present this data to their colleagues.

* * *

- 47 -

This is a problem and ladies and gentlemen if we're right ThermoDox is successful in the OPTIMA study it will be one of the most important new drugs in oncology and the generation if not our lifetime I believe that sincerely.

(Emphasis added.)

129.    Also on August 14, 2018, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

130.    The 2Q18 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study, which is described below. ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients from the HEAT Study***.

* * *

***These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion*** (n=285, 41% of the HEAT Study patients), ***treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone***. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. ***Median OS for the ThermoDox® group has been reached which translates into a two year survival benefit over the optimized RFA grou***p (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

131.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 2Q18 10-Q contained generic language related to how "[d]rug

development is an inherently uncertain process with a high risk of failure at every stage of development."

132.    The 2Q18 10-Q further stated, the following, in relevant part:

On November 29, 2016, the Company announced the results of an independent analysis conducted by the National Institutes of Health (the "NIH") from the HEAT Study *which reaffirmed the correlation between increased RFA burn time per tumor volume and improvements in overall survival*. The NIH analysis, which sought to evaluate the correlation between RFA burn time per tumor volume (min/ml) and clinical outcome, *concluded that increased burn time per tumor volume significantly improved overall survival in patients treated with RFA plus ThermoDox®* compared to patients treated with RFA alone.

(Emphasis added.)

### *November 14, 2018 Form 10-Q*

133.    On November 14, 2018, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

134.    The 3Q18 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study, which is described below. *The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients from the HEAT Study*.

* * *

*These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion* (n=285, 41% of the HEAT Study patients), *treatment with a*

- 49 -

>    ***combination of ThermoDox® and optimized RFA provided an average 54% risk
>    improvement in OS compared to optimized RFA alone***. The Hazard Ratio ("HR")
>    at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. ***Median OS for
>    the ThermoDox® group has been reached which translates into a two-year
>    survival benefit over the optimized RFA group*** (projected to be greater than 80
>    months for the ThermoDox® plus optimized RFA group compared to less than 60
>    months projection for the optimized RFA only group).

(Emphasis added.)

135.    Instead of opting to disclose specific and known risk factors particularly related to

the Phase 3 OPTIMA Study, the 3Q18 10-Q contained generic language related to how "[d]rug

development is an inherently uncertain process with a high risk of failure at every stage of

development."

136.    The 3Q18 10-Q further stated, the following, in relevant part:

>    On November 29, 2016, the Company announced the results of an independent
>    analysis conducted by the National Institutes of Health (the "NIH") from the HEAT
>    Study ***which reaffirmed the correlation between increased RFA burn time per
>    tumor volume and improvements in overall survival***. The NIH analysis, which
>    sought to evaluate the correlation between RFA burn time per tumor volume
>    (min/ml) and clinical outcome, ***concluded that increased burn time per tumor
>    volume significantly improved overall survival in patients treated with RFA plus
>    ThermoDox®*** compared to patients treated with RFA alone.

(Emphasis added.)

***March 29, 2019 Earnings Call and Form 10-K***

137.    On March 29, 2019, the Company hosted an earnings call with investors in

connection with Celsion's financial results for the fourth fiscal quarter and full fiscal year ended

December 31, 2018. During the call, Defendant Tardugno touted ThermoDox and the progress of

the Company's Phase 3 OPTIMA Study, stating, the following, in relevant part:

>    Among our many accomplishments, I'd like to emphasize that enrollment of our
>    pivotal 556 patient global phase 3 OPTIMA study in primary liver cancer, also
>    known as HCC, hepatocellular carcinoma, was completed ahead of projections in

August of 2018. And then we're now looking forward to the first of two pre-planned interim efficacy analysis for the OPTIMA study expected later this year. And if needed, the second interim will be sometime in mid-2020.

* * *

Our global HCC incidence is about 750,000. It's growing at about 3% annually. This is the largest unmet medical need in oncology today irrefutably, the largest unmet medical need remaining on oncology. These statistics come from the latest Global Cancer Statistical Database. We are well positioned for the market, OPTIMA is being conducted in 14 countries in North America, Europe, China and Eastern Asia, all the major markets for this indication.

138.    Also on March 29, 2019, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Tardugno, Church, Braun, Chow, Fritz, Hooper, Martinez, and Voss, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

139.    The 2018 10-K stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study, which is described below. *The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients from the HEAT Study*.

* * *

*These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion* (n=285, 41% of the HEAT Study patients), *treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone*. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. *Median OS for the ThermoDox® group has been reached which translates into a two-year*

- 51 -

*survival benefit over the optimized RFA group* (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

140.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 2018 10-K contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

141.    The 2018 10-K further stated, the following, in relevant part:

On November 29, 2016, the Company announced the results of an independent analysis conducted by the National Institutes of Health (the "NIH") from the HEAT Study *which reaffirmed the correlation between increased RFA burn time per tumor volume and improvements in overall survival*. The NIH analysis, which sought to evaluate the correlation between RFA burn time per tumor volume (min/ml) and clinical outcome, *concluded that increased burn time per tumor volume significantly improved overall survival in patients treated with RFA plus ThermoDox®* compared to patients treated with RFA alone.

***March 29, 2019 Proxy Statement***

142.    On March 29, 2019, the Company filed its Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Tardugno, Braun, Chow, Fritz, Hooper, Martinez, and Voss solicited the 2019 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

143.    The 2019 Proxy Statement called for shareholder approval of, among other things: (1) the election of three directors, and (2) the approval of an amendment to the 2018 Plan which would increase the limit of aggregate number of shares of common stock that may be delivered pursuant to all awards granted under the 2018 Plan by an additional 1.2 million shares of common stock (the "2019 Proposal").

144.    With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated, that it is "applicable to [the Company's] directors, officers, including the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other officers performing similar functions, and employees" and that it "constitutes a code of ethics applicable to senior financial officers within the meaning of the Sarbanes-Oxley Act of 2002 and SEC rules."

145.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

146.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company exaggerated ThermoDox's promise and potential effectiveness for treatment of primary liver cancer; (2) the Phase 3 OPTIMA Study was not likely to result in its primary endpoint of overall survival thereby minimizing the chance for FDA approval and commercialization; and (3) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

147.    As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders, among other things, elected Defendants Tardugno, Braun, and

Voss, which allowed them to continue breaching their fiduciary duties to Celsion, and approved the 2019 Proposal.

### May 15, 2019 Form 10-Q

148.   On May 15, 2019, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

149.   The 1Q19 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

> The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study (the "HEAT Study"). **The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients** from the HEAT Study.
>
> * * *
>
> **These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion** (n=285, 41% of the HEAT Study patients), **treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone**. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. **Median OS for the ThermoDox® group has been reached which translates into a two-year survival benefit over the optimized RFA group** (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

150.   Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 1Q19 10-Q contained generic language related to how "[d]rug

development is an inherently uncertain process with a high risk of failure at every stage of development."

151.    The 1Q19 10-Q further stated, the following, in relevant part:

On December 18, 2018, we announced that the DMC for the OPTIMA Study completed its last scheduled review of all patients enrolled in the trial and unanimously recommended that the OPTIMA Study continue according to protocol to its final data readout. The DMC's recommendation was based on the Committee's assessment of safety and data integrity of all patients randomized in the trial as of October 4, 2018.

* * *

We commissioned an independent computational model at the University of South Carolina Medical School. *The results unequivocally indicate that longer RFA heating times correlate with significant increases in doxorubicin concentration around the RFA treated tissue. In addition, we conducted a prospective preclinical study in 22 pigs using two different manufacturers of RFA and human equivalent doses of ThermoDox® that clearly support the relationship between increased heating duration and doxorubicin concentrations*.

(Emphasis added.)

### *August 14, 2019 Form 10-Q*

152.    On August 14, 2019, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

153.    The 2Q19 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study (the "HEAT Study"). ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients*** from the HEAT Study.

* * *

***These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion*** (n=285, 41% of the HEAT Study patients), ***treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone***. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. ***Median OS for the ThermoDox® group has been reached which translates into a two-year survival benefit over the optimized RFA group*** (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

154.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 2Q19 10-Q contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

155.    The 2Q19 10-Q further stated, the following, in relevant part:

On December 18, 2018, we announced that the DMC for the OPTIMA Study completed its last scheduled review of all patients enrolled in the trial and unanimously recommended that the OPTIMA Study continue according to protocol to its final data readout. The DMC's recommendation was based on the Committee's assessment of safety and data integrity of all patients randomized in the trial as of October 4, 2018.

* * *

We commissioned an independent computational model at the University of South Carolina Medical School. ***The results unequivocally indicate that longer RFA heating times correlate with significant increases in doxorubicin concentration around the RFA treated tissue. In addition, we conducted a prospective preclinical study in 22 pigs using two different manufacturers of RFA and***

- 56 -

*human equivalent doses of ThermoDox® that clearly support the relationship between increased heating duration and doxorubicin concentrations.*

\* \* \*

While the Company has not unblinded the study to report a hazard ratio, PFS and OS are tracking similarly to the subgroup of patients who received more than 45 minutes of RFA in our HEAT Study and followed prospectively for more than three years. ***This subgroup in the HEAT study demonstrated a 2-year overall survival advantage and a median time to death of more than 7 ½ years. This tracking appears to bode well for success at the next pre-planned interim efficacy analysis***, which is intended after a minimum of 158 patient deaths and is projected to occur during the second quarter of 2020. The hazard ratio for success at 158 events is 0.70. This is below the hazard ratio of 0.65 observed for the 285 patients in the HEAT Study subgroup of patients treated with RFA > 45 minutes.

\* \* \*

***The key finding was that increased RFA heating time per tumor volume significantly improved overall survival (OS) in patients with single-lesion HCC who were treated with RFA plus ThermoDox®, compared to patients treated with RFA alone***. A one-unit increase in RFA duration per tumor volume was shown to result in about a 20% improvement in OS for patients administered ThermoDox®, compared to RFA alone. ***The authors conclude that increasing RFA heating time in combination with ThermoDox® significantly improves OS and establishes an improvement of over two years versus the control arm when the heating time per milliliter of tumor is greater than 2.5 minutes. This finding is consistent with the Company's own results***, which defined the optimized RFA procedure as a 45-minute treatment for tumors with a diameter of 3 centimeters. Thus, ***the NIH analysis lends support to the hypothesis underpinning the OPTIMA Study***.

(Emphasis added.)

### August 15, 2019 Earnings Call

156.    On August 15, 2019, the Company hosted an earnings call with investors in connection with Celsion's financial results for the second fiscal quarter ended June 30, 2019. During the call, Defendant Tardugno touted ThermoDox and the progress of the Company's Phase 3 OPTIMA Study, stating, the following, in relevant part:

And I say perspective, I want to repeat this, I say at every conference call. Different than other subgroups, we identified a metric 45 minutes of heating to be critical for ThermoDox in combination with RFA to improve survival. We identified those patients in the study who had been treated with 45 minutes or more of RFA plus-minus ThermoDox. And then we followed them for 3 years to determine an overall survival benefit. ***And what we saw is I'll repeat again is nothing short of remarkable***. In this prospective evaluation of patients who are treated with standardized RFA more than 45 minutes, they demonstrate a median survival of more than 7.5 years when they combine this standardized RFA with ThermoDox. And that's a survival benefit of more than two years of the control group who received 45 minutes or more of RFA alone. I hope that's clear.

(Emphasis added.)

### November 4, 2019 Press Release

157.    On November 4, 2019, the Company issued a press release providing an encouraging update on the Company's Phase 3 OPTIMA Study and announcing that the independent Data Monitoring Committee unanimously recommended that the study continue. Defendant Tardugno was quoted in the press release, stating, in relevant part:

"We are encouraged by the recommendation of the iDMC to continue the OPTIMA Study according to plan. While we have not unblinded the study to report a hazard ratio, PFS is tracking similarly to the subgroup of patients who received more than 45 minutes of RFA in our HEAT Study and were followed prospectively for more than three years. This subgroup in the HEAT Study demonstrated a 2-year overall survival advantage and a median time to death of more than 7 ½ years. ***We believe this tracking bodes well for success at our next pre-planned interim efficacy analysis***, which is intended after a minimum of 158 patient deaths. We also note that the median follow-up for survival was only 25 months at time of data cutoff, which is too early for OS estimates, particularly when compared to the median follow-up for the HEAT Study subgroup which was 67 months. ["]

(Emphasis added.)

*November 14, 2019 Press Release and Form 10-Q*

158.    On November 14, 2019, the Company issued a press release in connection with

Celsion's financial results for the third fiscal quarter ended September 30, 2019. Defendant

Tardugno was quoted in the press release, stating, in relevant part:

> "Our focus on shareholder value remains uncompromised as Celsion continues to deliver results from our ongoing clinical development programs for ThermoDox® and GEN-1. Our smart use of venture debt to leverage the holdings of our equity investors, along with our strategy to avoid punitive financing deals has worked well for us and our shareholders. We enter the fourth quarter with sound fundamentals and a strong balance sheet that is expected to fund our clinical programs through transformative milestones over the next 16 months [."]

> \* \* \*

> "With the first of two preplanned interim efficacy analyses for the OPTIMA Study successfully behind us, we look forward to the promise and potential for success at the 2nd preplanned analysis, now expected to occur in the second quarter of 2020. ["]

159.    The press release continued to highlight ThermoDox and the Company's Phase 3

OPTIMA Study, stating, in relevant part:

> **iDMC Unanimously Recommends Continuation of Celsion's Phase III OPTIMA Study for ThermoDox® in Primary Liver Cancer.** On November 4, 2019 the Company announced that the iDMC unanimously recommended the OPTIMA Study continue according to protocol. The recommendation was based on a review of blinded safety and data integrity from 556 patients enrolled in the Company's multinational, double-blind, placebo-controlled pivotal Phase III study with ThermoDox® plus RFA in patients with HCC.

> The iDMC's pre-planned interim efficacy review followed 128 patient events, or deaths, which occurred in August 2019. Data presented demonstrated that progression-free survival (PFS) and overall survival (OS) data appear to be tracking with patient data observed at a similar point in the Company's 285 patient, well-balanced subgroup of patients followed prospectively in the earlier Phase III study (the "Prospective Subgroup") upon which the OPTIMA Study is based. This Prospective Subgroup demonstrated a 2-year overall survival advantage and a median time to death of more than 7 ½ years.

From the data review, ***the Company believes that the OPTIMA Study is well positioned for success at the next pre-planned interim efficacy analysis***, which is intended after a minimum of 158 patient deaths and is projected to occur during the second quarter of 2020. The hazard ratio for success at 158 events is 0.70. This is below the hazard ratio of 0.65 observed for the 285 patients in the HEAT Study Prospective Subgroup treated with RFA > 45 minutes.

(Emphasis added.)

160.    Also on November 14, 2019, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

161.    The 3Q19 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study (the "HEAT Study"). ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients*** from the HEAT Study.

\* \* \*

***These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion*** (n=285, 41% of the HEAT Study patients), ***treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone***. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. ***Median OS for the ThermoDox® group has been reached which translates into a two-year survival benefit over the optimized RFA group*** (projected to be greater than 80 months for the ThermoDox® plus optimized RFA group compared to less than 60 months projection for the optimized RFA only group).

(Emphasis added.)

162.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 3Q19 10-Q contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

163.    The 3Q19 10-Q further stated, the following, in relevant part:

On December 18, 2018, we announced that the DMC for the OPTIMA Study completed its last scheduled review of all patients enrolled in the trial and unanimously recommended that the OPTIMA Study continue according to protocol to its final data readout. The DMC's recommendation was based on the Committee's assessment of safety and data integrity of all patients randomized in the trial as of October 4, 2018.

* * *

We commissioned an independent computational model at the University of South Carolina Medical School. *The results unequivocally indicate that longer RFA heating times correlate with significant increases in doxorubicin concentration around the RFA treated tissue. In addition, we conducted a prospective preclinical study in 22 pigs using two different manufacturers of RFA and human equivalent doses of ThermoDox® that clearly support the relationship between increased heating duration and doxorubicin concentrations*.

* * *

While the Company has not unblinded the study to report a hazard ratio, PFS and OS are tracking similarly to the subgroup of patients who received more than 45 minutes of RFA in our HEAT Study and followed prospectively for more than three years. *This subgroup in the HEAT study demonstrated a 2-year overall survival advantage and a median time to death of more than 7 ½ years. This tracking appears to bode well for success at the next pre-planned interim efficacy analysis*, which is intended after a minimum of 158 patient deaths and is projected to occur during the second quarter of 2020. The hazard ratio for success at 158 events is 0.70. This is below the hazard ratio of 0.65 observed for the 285 patients in the HEAT Study subgroup of patients treated with RFA > 45 minutes.

* * *

*The key finding was that increased RFA heating time per tumor volume significantly improved overall survival (OS) in patients with single-lesion HCC*

*who were treated with RFA plus ThermoDox®, compared to patients treated with RFA alone*. A one-unit increase in RFA duration per tumor volume was shown to result in about a 20% improvement in OS for patients administered ThermoDox®, compared to RFA alone. *The authors conclude that increasing RFA heating time in combination with ThermoDox® significantly improves OS and establishes an improvement of over two years versus the control arm when the heating time per milliliter of tumor is greater than 2.5 minutes. This finding is consistent with the Company's own* results, which defined the optimized RFA procedure as a 45-minute treatment for tumors with a diameter of 3 centimeters. Thus, *the NIH analysis lends support to the hypothesis underpinning the OPTIMA Study*.

(Emphasis added.)

### November 15, 2019 Earnings Call

164.    On November 15, 2019, the Company hosted an earnings call with investors in connection with Celsion's financial results for the third fiscal quarter ended September 30, 2019. During the call, Defendant Tardugno touted ThermoDox and the progress of the Company's Phase 3 OPTIMA Study, stating, the following, in relevant part:

> I'll now turn to the positive news regarding the recommendation from the DMC from the OPTIMA Study following a review of the unblinded data at the first pre-specified interim efficacy analysis. The committee unanimously recommended that we continue the study as planned. For this analysis, the DMC reviewed data following 128 patient deaths which occurred early in August 2019. The committee found no evidence of futility or any safety issues of concern in this 556 patient study.
>
> * * *
>
> Even more encouraging was the suggestion that they made, that the company should consider a compassionate use program in China. We see this as a positive, we certainly do; and are making plans under Dr. Borys' direction to launch a program in high volume, high quality clinical sites to participate in the OPTIMA Study.

- 62 -

### *March 3, 2020 Letter to Stockholders*

165.     On March 3, 2020, Defendant Tardugno and the Company issued a letter to Company stockholders. The letter stated the following, in relevant part:

> **First**, we now count among our stockholders four institutional investors that have been following our progress with ThermoDox® over a sufficiently long period of time to fully understand our technology and the potential for success of our global Phase III OPTIMA Study in primary liver cancer, or HCC. As we have said, positive trial results will be transformational – for patients with HCC, for physicians, for our employees and for you, our stockholders. I believe these new investors recognize they are financing a drug development program that holds the promise to make a measurable difference for the global medical community.

(Emphasis in original.)

### *March 25, 2020 Form 10-K*

166.     On March 25, 2020, the Company filed the 2019 10-K. The 2019 10-K was signed by Defendants Tardugno, Church, Braun, Chow, Fritz, Hooper, Martinez, and Voss, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

167.     The 2019 10-K stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

> The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial conducted by the Company called the HEAT Study (the "HEAT Study"). ***The OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of 285 patients*** from the HEAT Study.

* * *

- 63 -

*These results demonstrated that in a large, well bounded, subgroup of patients with a single lesion* (n=285, 41% of the HEAT Study patients), *treatment with a combination of ThermoDox® and optimized RFA provided an average 54% risk improvement in OS compared to optimized RFA alone*. The Hazard Ratio ("HR") at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. *Median OS for the ThermoDox® subgroup has been reached which translates into a two-year survival benefit over the optimized RFA subgroup* (projected to be greater than 80 months for the ThermoDox® plus optimized RFA subgroup compared to less than 60 months projection for the optimized RFA only subgroup).

(Emphasis added.)

168.    Instead of opting to disclose specific and known risk factors particularly related to the Phase 3 OPTIMA Study, the 2019 10-K contained generic language related to how "[d]rug development is an inherently uncertain process with a high risk of failure at every stage of development."

169.    The 2019 10-K further stated, the following, in relevant part:

On December 18, 2018, we announced that the DMC for the OPTIMA Study completed its last scheduled review of all patients enrolled in the trial and unanimously recommended that the OPTIMA Study continue according to protocol to its final data readout. The DMC's recommendation was based on the Committee's assessment of safety and data integrity of all patients randomized in the trial as of October 4, 2018.

* * *

We commissioned an independent computational model at the University of South Carolina Medical School. *The results unequivocally indicate that longer RFA heating times correlate with significant increases in doxorubicin concentration around the RFA treated tissue. In addition, we conducted a prospective preclinical study in 22 pigs using two different manufacturers of RFA and human equivalent doses of ThermoDox® that clearly support the relationship between increased heating duration and doxorubicin concentrations.*

* * *

While the Company has not unblinded the study to report a hazard ratio, PFS and OS are tracking similarly to the subgroup of patients who received more than 45 minutes of RFA in our HEAT Study and followed prospectively for more than three

- 64 -

years. ***This subgroup in the HEAT Study demonstrated a 2-year overall survival advantage and a median time to death of more than 7 ½ years. This tracking appears to bode well for success at the second of two pre-planned interim efficacy analysis***, which is intended after a minimum of 158 patient deaths and is projected to occur during the second quarter of 2020. The hazard ratio for success at 158 events is 0.70. This is below the hazard ratio of 0.65 observed in the HEAT Study subgroup of patients treated with RFA > 45 minutes.

* * *

***The key finding was that increased RFA heating time per tumor volume significantly improved overall survival (OS) in patients with single-lesion HCC who were treated with RFA plus ThermoDox®, compared to patients treated with RFA alone***. A one-unit increase in RFA duration per tumor volume was shown to result in about a 20% improvement in OS for patients administered ThermoDox®, compared to RFA alone. ***The authors conclude that increasing RFA heating time in combination with ThermoDox® significantly improves OS and establishes an improvement of over two years versus the control arm when the heating time per milliliter of tumor is greater than 2.5 minutes. This finding is consistent with the Company's own*** results, which defined the optimized RFA procedure as a 45-minute treatment for tumors with a diameter of 3 centimeters. Thus, ***the NIH analysis lends support to the hypothesis underpinning the OPTIMA Study***.

(Emphasis added.)

### April 15, 2020 Press Release

170.    On April 15, 2020, the Company published a press release which announced that "sufficient events" had been reached for the second pre-specified interim analysis of the Company's Phase 3 OPTIMA Study. In the press release, Defendant Tardugno was quoted as stating the following, in relevant part:

> "We look forward to receiving the iDMC's recommendation from this data analysis, and are ***quite optimistic for a positive outcome. Regardless, we believe that the OPTIMA Study is ultimately well-positioned for success***. . . . We base our confidence on published pre-clinical data supporting the OPTIMA Study, the National Institutes of Health's independent analysis of and support for the Study's hypothesis, and the OPTIMA Study's current timeline for disease progression and patient death, both tracking in line with the prospective HEAT Study subgroup. The prospective subgroup demonstrated a remarkable 7 ½ years plus survival when

treated with ThermoDox® plus RFA. A successful study has 'blockbuster' revenue potential and more importantly, will be transformational for patients with HCC, with over 750,000 incidence annually, the largest unmet need in oncology."

(Emphasis added.)

### *April 29, 2020 Proxy Statement*

171.    On April 29, 2020, the Company filed the 2020 Proxy Statement. Defendants Tardugno, Braun, Chow, Fritz, Hooper, Martinez, and Voss solicited the 2020 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

172.    The 2020 Proxy Statement called for shareholder approval of, among other things: (1) the election of two directors, and (2) the approval of another amendment to the 2018 Plan which would increase the limit of aggregate number of shares of common stock that may be delivered pursuant to all awards granted under the 2018 Plan by an additional 2.5 million shares of common stock (the "2020 Proposal").

173.    With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated, that it is "applicable to [the Company's] directors, officers, including the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and other officers performing similar functions, and employees" and that it "constitutes a code of ethics applicable to senior financial officers within the meaning of the Sarbanes-Oxley Act of 2002 and SEC rules."

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

174.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

175.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company exaggerated ThermoDox's promise and potential effectiveness for treatment of primary liver cancer; (2) the Phase 3 OPTIMA Study was not likely to result in its primary endpoint of overall survival thereby minimizing the chance for FDA approval and commercialization; and (3) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

176.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, among other things, elected Defendants Chow and Fritz, which allowed them to continue breaching their fiduciary duties to Celsion, and approved the 2020 Proposal.

### May 15, 2020 Earnings Call and Form 10-Q

177.    On May 15, 2020, the Company hosted an earnings call with investors in connection with Celsion's financial results for the first fiscal quarter ended March 31, 2020. During the call, Defendant Tardugno touted ThermoDox and the progress of the Company's Phase 3 OPTIMA Study, stating, the following, in relevant part:

> *We've had a great deal of exciting news during the first quarter in recent weeks from both of our lead programs, first and critically important, our ThermoDox Phase III OPTIMA Study for the treatment of newly diagnosed hepatocellular carcinoma or primary liver cancer reached the prescribed number of events in April for our second pre-planned in term efficacy analysis* and I will discuss this more in a minute.

- 67 -

\* \* \*

Now, as I said before, ***we believe that, there's a very good potential for success at this analysis***, but of course it's not a short, the Company remains blinded. I'd like to give you some insight into the support for our belief that the study is on track for success. Supporting our belief is our comparison of the threshold for success to the data from the data that OPTIMA Study was based on. The P-value and the hazard ratio for OPTIMA success and 158 events are 0.022 and 0.7 respectively. Pvalue for success is 0.022. The hazard ratio for success is 0.70 respectively.

\* \* \*

***I will again remind you also that our confidence of any underlying hypothesis supporting the OPTIMA Study is not hours long. Thought leaders from the medical community and distinguished scientists have weighed in. Conclusions from peer reviewed manuscripts including published preclinical data supporting the OPTIMA Study, the public HEAT Study manuscript validating the subgroup results, and again, the NIH is published analysis in support of the HEAT studies hypothesis all pointing in the same direction***.

(Emphases added).

178.    Also on May 15, 2020, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal year ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Tardugno and Church, and contained SOX certifications signed by Defendants Tardugno and Church attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

179.    The 1Q20 10-Q stated the following regarding ThermoDox's effect on overall survival and the Phase 3 OPTIMA Study:

The trial design of the OPTIMA Study is based on the comprehensive analysis of data from an earlier clinical trial called the HEAT Study (the "HEAT Study"). The ***OPTIMA Study is supported by a hypothesis developed from an overall survival analysis of a large subgroup of patients*** from the HEAT Study.

- 68 -

* * *

> ***These results demonstrated that in a large, well bounded, subgroup of patients
> with a single lesion*** (n=285, 41% of the HEAT Study patients), ***treatment with a
> combination of ThermoDox® and optimized RFA provided an average 54% risk
> improvement in OS compared to optimized RFA alone***. The Hazard Ratio ("HR")
> at this analysis is 0.65 (95% CI 0.45 - 0.94) with a p-value of 0.02. ***Median OS for
> the ThermoDox® group has been reached which translates into a two-year
> survival benefit over the optimized RFA group*** (projected to be greater than 80
> months for the ThermoDox® plus optimized RFA group compared to less than 60
> months projection for the optimized RFA only group).

(Emphasis added.)

180.    Instead of opting to disclose specific and known risk factors particularly related to
the Phase 3 OPTIMA Study, the 1Q20 10-Q contained generic language related to how "[d]rug
development is an inherently uncertain process with a high risk of failure at every stage of
development."

181.    The 1Q20 10-Q further stated, the following, in relevant part:

> On December 18, 2018, we announced that the DMC for the OPTIMA Study
> completed its last scheduled review of all patients enrolled in the trial and
> unanimously recommended that the OPTIMA Study continue according to protocol
> to its final data readout. The DMC's recommendation was based on the
> Committee's assessment of safety and data integrity of all patients randomized in
> the trial as of October 4, 2018.

* * *

> We commissioned an independent computational model at the University of South
> Carolina Medical School. ***The results unequivocally indicate that longer RFA
> heating times correlate with significant increases in doxorubicin concentration
> around the RFA treated tissue***. ***In addition, we conducted a prospective
> preclinical study in 22 pigs using two different manufacturers of RFA and
> human equivalent doses of ThermoDox® that clearly support the relationship
> between increased heating duration and doxorubicin concentrations***.

* * *

While the Company has not unblinded the study to report a hazard ratio, PFS and OS are tracking similarly to the subgroup of patients who received more than 45 minutes of RFA in our HEAT Study and followed prospectively for more than three years. *This subgroup in the HEAT Study demonstrated a 2-year overall survival advantage and a median time to death of more than 7 ½ years. This tracking appears to bode well for success at the second of two pre-planned interim efficacy analysis*, which is intended after a minimum of 158 patient deaths and is projected to occur during the second quarter of 2020. The hazard ratio for success at 158 events is 0.70. This is below the hazard ratio of 0.65 observed in the HEAT Study subgroup of patients treated with RFA > 45 minutes.

* * *

*The key finding was that increased RFA heating time per tumor volume significantly improved overall survival (OS) in patients with single-lesion HCC who were treated with RFA plus ThermoDox®, compared to patients treated with RFA alone*. A one-unit increase in RFA duration per tumor volume was shown to result in about a 20% improvement in OS for patients administered ThermoDox®, compared to RFA alone. *The authors conclude that increasing RFA heating time in combination with ThermoDox® significantly improves OS and establishes an improvement of over two years versus the control arm when the heating time per milliliter of tumor is greater than 2.5 minutes. This finding is consistent with the Company's own* results, which defined the optimized RFA procedure as a 45-minute treatment for tumors with a diameter of 3 centimeters. Thus, *the NIH analysis lends support to the hypothesis underpinning the OPTIMA Study*.

(Emphasis added.)

### June 25, 2020 Press Release

182.    On June 25, 2020, the Company published a press release which announced that an independent Data Monitoring Committee was scheduled to meet during the first half of July to conduct the second pre-planned interim safety and efficacy analysis of the Company's Phase 3 OPTIMA Study. In the press release, Defendant Tardugno was quoted as stating the following, in relevant part:

"The iDMC meeting is expected to take place as planned and we look forward to receiving their recommendation. While we are hopeful for a positive outcome, it is not a binary event for the OPTIMA Study. Should the data not reach the threshold

for success, we believe the OPTIMA Study is ultimately well-positioned for success at the final analysis, if necessary. The final analysis would be based on 197 patient deaths where the hazard ratio for success is 0.75 or a 25% reduction in the risk of death, with a p-Value = 0.042. We believe that a successful study has blockbuster revenue potential and, more importantly, will be globally transformational for patients with HCC, the largest unmet need in oncology with more than 750,000 cases annually."

(Emphasis added.)

183.    The statements referenced in ¶¶ 79–116, 123–141, 148–170, 177–182, herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company exaggerated ThermoDox's promise and potential effectiveness for treatment of primary liver cancer; (2) the Phase 3 OPTIMA Study was not likely to result in its primary endpoint of overall survival thereby minimizing the chance for FDA approval and commercialization; and (3) the Company failed to maintain internal and disclosure controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

184.    Before the market opened on July 13, 2020, the Company issued a press release announcing that Celsion had "received a recommendation from the independent Data Monitoring Committee (DMC) to consider stopping the [Phase 3 OPTIMA Study]." The press release further stated that "[t]he recommendation was made following the second pre-planned interim safety and efficacy analysis by the DMC on July 9, 2020" and explained that the analysis found that "the pre-specified boundary for stopping the trial for futility of 0.900 was crossed with an actual value of 0.903."

185.     On this news, the price of the Company's stock plunged from $3.58 per share at the close of trading on July 10, 2020, to $1.29 per share at the close of trading on July 13, 2020, representing a loss in value of $2.29 per share, or nearly 63.97%, on massive trading volume.

186.     Thereafter, the Company's stock dwindled in the months following the news and, on October 13, 2020, the Company received notice from the NASDAQ informing Celsion that it was not in compliance with the minimum bid price requirement for continued inclusion on NASDAQ under Listing Rule 5550(a)(2) since the closing bid price of the Company's common stock had been below $1.00 per share for the previous 30 consecutive business days.

## DAMAGES TO CELSION

187.     As a direct and proximate result of the Individual Defendants' conduct, Celsion will lose and expend many millions of dollars.

188.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its CFO, and its CMO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

189.     Such losses include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

190.     As a direct and proximate result of the Individual Defendants' conduct, Celsion has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

191.   Plaintiff brings this action derivatively and for the benefit of Celsion to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Celsion, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

192.   Celsion is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

193.   Plaintiff is, and has been at all relevant times, a Celsion shareholder. Plaintiff will adequately and fairly represent the interests of Celsion in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

194.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

195.   A pre-suit demand on the Board of Celsion is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Tardugno, Braun, Chow, Fritz, Hooper, and Voss (the "Directors"). Plaintiff only needs to allege demand futility as to three of the six Directors who are on the Board at the time this action is commenced.

196.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they

engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

197.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

198.    Additional reasons that demand on Defendant Tardugno is futile follow. Defendant Tardugno has served as the Company's President and CEO since January 3, 2007, as a Company director since January 22, 2007, and as Chairman of the Board since October 2014. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Tardugno with his principal occupation, and he receives handsome compensation, including, for instance, $1,251,640 for the fiscal year ended December 31, 2019. As the Company provides Defendant Tardugno with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Celsion. Defendant Tardugno was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein. As the Company's highest officer, he conducted little, if any, oversight of the

scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Tardugno signed, and signed SOX certifications for, the 2017 10-K, 2018 10-K, and 2019 10-K and the Company's quarterly reports filed on Form 10-Q referenced herein. Moreover, Defendant Tardugno is a defendant in the Securities Class Action. For these reasons, Defendant Tardugno breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Braun is futile follow. Defendant Braun has served as a Company director since December 2015. He also serves as a member of the Science and Technology Committee. Defendant Braun has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Braun signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Braun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Chow is futile follow. Defendant Chow has served as a Company director since March 2007. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Chow has received

- 75 -

and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chow signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Chow breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Fritz is futile follow. Defendant Fritz has served as a Company director since July 2011. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. Defendant Fritz has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fritz signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Fritz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on Defendant Hooper is futile follow. Defendant Hooper has served as a Company director since July 2010. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee.

Defendant Hooper has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hooper signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Hooper breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Voss is futile follow. Defendant Voss has served as a Company director since December 2015. He also serves as the Chair of the Science and Technology Committee. Defendant Voss has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Voss signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Voss breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204.    Additional reasons that demand on the Board is futile follow.

205.    Pursuant to the 2018 Proxy Statement, 2019 Proxy Statement, and 2020 Proxy Statement (the "Proxy Statements"), the Directors solicited shareholders approve their approve their incentive compensation provided by the 2018 Plan and amendments to increase the number of shares reserved for their own benefit. These financial incentives precluded the Directors from acting in the best interests of the shareholders, as they could not simultaneously request approval of the 2018 Plan and its amendments while also failing to provide shareholders with information in the Proxy Statements regarding the true state of the Company. Their solicitations, which they materially benefitted from, and the approval of their proposals were based on materially false and misleading statements. The Directors are thus conflicted from considering a demand against them based on these circumstances as well.

206.    Furthermore, the Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Tardugno served as the Executive Vice President of Songbird Hearing, Inc. ("Songbird") from 1998 to 2005 while Defendant Fritz served as Songbird's President and CEO from 1997 until 2002. Defendants Tardugno, Chow, Fritz, and Hooper have served together on the Company's Board for at least a decade, and Defendants Braun and Voss have served together and with the other Directors for nearly six years. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

207.    Defendants Chow and Fritz served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, Defendants Chow and

Fritz were responsible for overseeing, *inter alia*, the Company's compliance with applicable laws and regulations, the Company's accounting and financial reporting processes, and the performance of the Company's internal audit function. Defendants Chow and Fritz failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, Defendants Chow and Fritz breached their fiduciary duties, are not disinterested, and demand is excused.

208. Defendants Braun and Voss served on the Company's Science and Technology Committee during the Relevant Period. Pursuant to the Company's Science and Technology Committee Charter, Defendants Braun and Voss were responsible for overseeing, *inter alia*, the Company's development with key technologies and major science and medicine-driven innovation initiatives essential to the long-term success of Celsion. Defendants Braun and Voss failed to provide appropriate guidance on the direction of the Company's science and technology activities, which allowed the Company to exaggerate the Phase 3 OPTIMA Study and its prospects. Thus, the Defendants Braun and Voss breached their fiduciary duties, are not disinterested, and demand is excused.

209. In addition, given their extensive and relevant education and experience in the healthcare industry, as detailed herein, Defendants Tardugno, Braun, Fritz, Hooper, and Voss, fully understood the true potential for the success of the Phase 3 OPTIMA Study and that the likelihood was that the Phase 3 OPTIMA Study would fail. For example, *inter alia*, Defendant Braun earned a Ph.D in Immunology and Microbiology and has over 30 years of research expertise in oncology. Defendant Voss is a medical doctor and currently serves as Vice President of Clinical Affairs in

Europe at a biotechnology company focused on implementing personalized medicine in oncology. Defendant Tardugno has nearly 30 years of experience exclusively in the healthcare industry. Defendant Hooper had served in various leadership positions (including President) with Abbott Laboratories. Defendant Fritz is currently the CEO of a developmental-stage diagnostic device company and founded a biotech company. Despite the foregoing, Defendants Tardugno, Braun, Fritz, Hooper, and Voss failed to correct the materially false and misleading statements and omissions issued throughout the Relevant Period, as detailed herein, and, as a result, face a substantial likelihood of liability. Thus, Defendants Tardugno, Braun, Fritz, Hooper, and Voss breached their fiduciary duties, are not disinterested, and demand is excused.

210.   In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

211.   Celsion has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Celsion any part of the damages Celsion suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

212.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

213.    The acts complained of herein constitute violations of fiduciary duties owed by Celsion's officers and directors, and these acts are incapable of ratification.

214.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Celsion. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Celsion, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

215. If there is no directors' and officers' liability insurance, then the Directors will not cause Celsion to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

216. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

217. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

219. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

220.    Under the direction and watch of the Directors, the Proxy Statements failed to disclose, *inter alia*, that: (1) the Company exaggerated ThermoDox's promise and potential effectiveness for treatment of primary liver cancer; (2) the Phase 3 OPTIMA Study was not likely to result in its primary endpoint of overall survival thereby minimizing the chance for FDA approval and commercialization; and (3) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

221.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

222.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

223.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting and failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors,

ratification of the appointment of an independent auditor, advisory approval of executive compensation, and approval of the 2018 Proposal, 2019 Proposal, and 2020 Proposal.

224.    The false and misleading elements of the Proxy Statements led to the approval of, among other things, the 2018 Proposal, 2019 Proposal, and 2020 Proposal, and to the election of Defendants Tardugno, Braun, Chow, Fritz, Hooper, and Voss which allowed them to continue breaching their fiduciary duties to Celsion.

225.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

226.    Plaintiff on behalf of Celsion has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

227.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Celsion's business and affairs.

229.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

230.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Celsion.

231.   In breach of their fiduciary duties owed to Celsion, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company exaggerated ThermoDox's promise and potential effectiveness for treatment of primary liver cancer; (2) the Phase 3 OPTIMA Study was not likely to result in its primary endpoint of overall survival thereby minimizing the chance for FDA approval and commercialization; and (3) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

232.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

233.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

234.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Celsion's securities.

235.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Celsion's securities.

236.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

237.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Celsion has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

238.    Plaintiff on behalf of Celsion has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

239.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Celsion.

- 86 -

241.    The Individual Defendants either benefitted financially from the improper conduct and their received profits, bonuses, stock options, or similar compensation from Celsion that was tied to the performance or artificially inflated valuation of Celsion, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

242.    Plaintiff, as a shareholder and a representative of Celsion, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

243.    Plaintiff on behalf of Celsion has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

244.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Celsion to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

246.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

247.    Plaintiff on behalf of Celsion has no adequate remedy at law.

## FIFTH CLAIM

**Against Defendants Tardugno, Church, and Borys for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

248.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.    Celsion, along with Defendants Tardugno, Church, and Borys are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Tardugno, Church, and Borys's willful and/or reckless violations of their obligations as officers and/or directors of Celsion.

250.    Defendants Tardugno, Church, and Borys, because of their positions of control and authority as officers and/or directors of Celsion, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Celsion, including the wrongful acts complained of herein and in the Securities Class Action.

251.    Accordingly, Defendants Tardugno, Church, and Borys are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

252.    As such, Celsion is entitled to receive all appropriate contribution or indemnification from Defendants Tardugno, Church, and Borys.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Celsion, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Celsion;

(c)    Determining and awarding to Celsion the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Celsion and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Celsion and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Celsion to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

(e)     Awarding Celsion restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: February 16, 2021                    Respectfully submitted,

**PAWAR LAW GROUP, P.C.**

*/s/ Vik Pawar*
Vik Pawar
20 Vesey Street, Suite 1410
New York, NY 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

*Local Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I,    Timothy Fidler    am    a    plaintiff    in    the    within    action.
I  have  reviewed    the    allegations    made    in    this    shareholder    derivative
complaint, know  the  contents    thereof,    and  authorize  its  filing.  To  those  allegations
of   which I   have personal knowledge,  I believe  those allegations  to  be  true.  As  to  those
allegations of  which I  do  not have  personal knowledge,  I rely  upon  my  counsel  and their
investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th
day of _____, 2021.

2/16/2021

DocuSigned by:

*Timothy Fidler*

9A9F8CC6B519496...

Timothy Fidler